UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| WAINESHET TEFERA, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Civil Action No. 13-11552-DJC |
| CAROLYN COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) ) | |
| Defendant. | ) ) | |

# MEMORANDUM AND ORDER

CASPER, J.                                                                                              November 25, 2014

## I.  Introduction

Plaintiff Waineshet Tefera ("Tefera") was overpaid Social Security benefits at various points between April 1995 and August 2003. R. 16-17.[1] Tefera sought waiver of overpayment recovery and the Social Security Administration ("the SSA") denied Tefera's request. R. 20, 62, 65-66. Pursuant to the procedures set forth in the Social Security Act ("the Act"), 42 U.S.C. §§ 405(g), 1383(c)(3), Tefera, proceeding *pro se*, brings this action for judicial review of the final decision of Defendant Caroline Colvin, Acting Commissioner of the Social Security Administration ("the Commissioner"), issued by an Administrative Law Judge ("ALJ") on August 19, 2011. R. 12-15. Before the Court are Tefera's motion to reverse the decision of the Commissioner, D. 15, and the Commissioner's motion to affirm, D. 18. For the reasons

---

[1] The administrative record has been filed in the Clerk's Office. D. 4. Citations to the administrative record are referenced as "R."

discussed below, Tefera's motion, D. 15, is ALLOWED, the Commissioner's motion, D. 18, is DENIED and the matter is remanded to the ALJ for further proceedings.

## II. Relevant Facts

Tefera received Social Security benefits from April 1995 through August 2003.[2] R. 16-17. In December 1997, Tefera submitted a Work Activity Report[3] to the SSA, in which she reported working since October 1997 as a part-time cashier five days a week earning $6.00 an hour. R. 68-70. In April 2002, the SSA sent Tefera a letter stating that her reported earnings for 1995, 1997, 1998, 1999 and 2000 were $271.80, $1,566, $9,126.65, $7,380.50 and $20,636.93, respectively, and asking for additional work information. R. 77. Tefera subsequently completed another Work Activity Report to the SSA in August 2003 indicating that she worked as a cashier until December 1998 and then worked off and on until March 2000 when she started a position in data processing earning $10.00 an hour at a bank. R. 80-83. In June 2001, Tefera was laid off by the bank because back problems prevented her from lifting heavy boxes. R. 76, 81. According to the report, Tefera did not work again until January 2003 when she became a research assistant making $13.25 an hour at a hospital. R. 84. Tefera collected unemployment benefits for a period between June 2001 and January 2003. R. 57.

## III. Procedural Background

On October 8, 2003, the SSA notified Tefera that she was overpaid $37,476.50 in disability insurance benefits at various points between January 1999 and August 2003 and had to

---

[2] The breakdown with respect to which Social Security benefits Tefera received at different periods between 1995 and 2003 is unclear. The record indicates that Tefera initially received both disability insurance benefits ("SSDI") and supplemental security income ("SSI"), R. 124, but by 2003 was receiving only SSDI, R. 80.

[3] The Work Activity Report is an SSA form used to monitor work and earnings of individuals who claim, among other things, SSDI and SSI. See, e.g., R. 68-71, 80-87.

refund the overpayment, in whole or in part, within thirty days. R. 45. Tefera filed a Request for Waiver of Overpayment Recovery at the end of October, contending that the overpayment was not her fault because she sent her paystubs to the local SSA office and "[kept] calling the 1-800 number to stop the payment[s]." R. 49-51, 56. Tefera also argued that she could not afford to repay the money because her monthly income went towards rent and her daughter's after-school program. R. 51. In March 2004, the SSA sent Tefera a second notice explaining that the overpayment occurred during periods when Tefera's benefits were suspended or terminated. R. 59. The SSA identified the suspension periods as January 1999 to July 1999, December 1999, and July 2001 to October 2001, and the termination period as November 2001 to August 2003. Id. The notice again instructed Tefera to repay all or some of the money within thirty days. Id.

On March 4, 2005, the SSA denied Tefera's waiver request but informed her that she had the right to appeal the denial by appearing at a conference. R. 62. Tefera did not appear at the scheduled conference or request that it be rescheduled prior to that date. R. 65. Although SSA indicated a willingness to reschedule it when the agency was contacted on her behalf after the scheduled conference, neither Tefera nor any representative on her behalf followed up on this request. D. 66. Accordingly, the SSA's affirmed its decision to deny her waiver request. D. 65, 66.

Tefera requested reconsideration of the SSA's decision on August 15, 2005. R. 24. In December 2009, the SSA informed Tefera that it had reviewed her case and recalculated the overpayment for which she was responsible as $22,337.90 and denied her request for reconsideration. R. 16-17, 20. Tefera submitted a second request for reconsideration, which was denied, for the reasons that the SSA had previously stated, in a letter dated April 6, 2010. R. 24. Tefera filed a timely request for a hearing before an ALJ pursuant to SSA regulations. R. 35-36.

A hearing was held before the ALJ on August 4, 2011. R. 119. In a written decision dated August 19, 2011, the ALJ affirmed the denial of Tefera's request for a waiver of recovery of the overpayment. R. 12-15. Tefera requested a review of the ALJ's decision and the Appeals Council denied the request on May 23, 2013. R. 3. Accordingly, the ALJ's decision is the final decision of the Commissioner. Id.

## IV. Discussion

### A. Legal Standards

#### 1. Waiver of Recovery of Overpayment

The Social Security Act provides that the SSA may seek recovery of amounts that were overpaid to an individual who has received more than the correct payment under Title II of the Act. 42 U.S.C. § 404(a). However, the Commissioner's regulations provide that recovery of an overpayment shall be waived if: (1) the recipient is found to be without fault in causing the overpayment, and (2) the "recovery would either defeat the purpose of [T]itle II . . . or be against equity and good conscience." 20 C.F.R. § 404.506(a). The burden is on the claimant to establish that she meets both of these requirements for waiver. See Jones v. Soc. Sec. Admin., No. 03-12436-DPW, 2004 WL 2915290, at *2 (D. Mass. Dec. 14, 2004), aff'd, 150 Fed. Appx. 1 (1st Cir. 2005).

As to the first prong, fault on the part of the claimant depends on whether the overpayment was the result of:

> (a) [a]n incorrect statement made by the individual which he knew or should have known to be incorrect; or
> (b) [f]ailure to furnish information which he knew or should have known to be material; or
> (c) . . . acceptance of a payment which he either knew or could have been expected to know was incorrect.

4

20 C.F.R. §§ 404.507(a)-(c). "If a claimant fails to establish that [s]he was without fault, analysis of the second prong is unnecessary." Yankun v. Barnhart, 473 F. Supp. 2d 147, 150 (D. Mass. 2006). However, if the claimant is found to be without fault under § 404.507, then the subsequent analysis of the Title II purposes and equity and good conscience factors must consider, respectively, whether the claimant "needs substantially all of [her] current income (including social security benefits) to meet current ordinary and necessary living expenses," 20 C.F.R. § 404.508(b), or whether the claimant "[c]hanged . . . her position for the worse . . . or relinquished a valuable right . . . because of reliance upon a notice that a payment would be made or because of the overpayment itself," id. § 404.509(a)(1); see id. § 404.506(a).

Reliance on erroneous information from an SSA official also may be grounds for waiver of repayment of an overpayment. See Beaudry v. Sec'y of Health & Human Servs., No. 90-30093-F, 1991 WL 319161, at *4, 7-8 (D. Mass. Sept. 24, 1991) (outlining legal standard for waiver determination based upon such reliance). Specifically, a claimant will be considered without fault in accepting the overpayment if it is determined that acceptance of the overpayment resulted from:

> [R]eliance on erroneous information from an official source within the [SSA] (or other governmental agency which the individual had reasonable cause to believe was connected with the administration of benefits under title II . . . of the Act) with respect to the interpretation of a pertinent provision of the . . . Act or regulations pertaining thereto.

20 C.F.R. § 404.510a. "In the situations described in . . . [§] 404.510a, adjustment or recovery will be waived since it will be deemed such adjustment or recovery is against equity and good conscience." Id. § 404.512(a). The Commissioner "has thus by regulation specified that a claimant who meets the standard of § 404.510a . . . is automatically entitled to a waiver." Pettegrove v. Bowen, No. 85-0367 B, 1986 WL 83450, at *3 (D. Me. July 21, 1986). In other

words, this avenue for relief circumvents a separate and subsequent analysis of the Title II or equity and good conscience factors pursuant to 20 C.F.R. §§ 404.508(b) and 404.509(a)(1), respectively, and "instead grants a claimant waiver of recovery automatically if the claimant is without fault, as specifically defined." Beaudry, 1991 WL 319161, at *4; see Gladden v. Callahan, 139 F.3d 1219, 1223 (8th Cir. 1998) (noting that "someone who relies on erroneous information from an official source meets both requirements for waiver set forth in 42 U.S.C. § 404(b): he or she is without fault, and recovery would be against equity and good conscience") (emphasis in original).

    2.    *Standard of Review*

This Court has the power to affirm, modify, or reverse a decision of the Commissioner upon review of the pleadings and record. 42 U.S.C. § 405(g). Such review is limited to an evaluation of "whether there is substantial evidence to support the ALJ's fact finding and whether appropriate legal standards were employed." Jones, 150 Fed. Appx. at 1-2 (citing Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999)). Substantial evidence exists "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion." Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981); see 42 U.S.C. § 405(b),(g). "It is the ALJ's prerogative to resolve conflicting evidence," Vazquez-Rosario v. Barnhart, 149 Fed. Appx. 8, 10 (1st Cir. 2005), meaning that the reviewing court must adhere to the ALJ's decision "even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence." Whitzel v. Astrue, 792 F. Supp. 2d 143, 148 (D. Mass. 2011) (quoting Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 3 (1st Cir. 1987)). However, denial of relief will not be upheld where there has been an error of law. See Manso-Pizarro v. Sec'y of Health & Human

Servs., 76 F.3d 15, 16 (1st Cir. 1996). The district court reviews questions of law *de novo*. Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).

### B.     **Before the ALJ**

####    *1.    ALJ Hearing*

At the August 4, 2011 administrative hearing, the ALJ heard testimony from Tefera, who appeared *pro se*. R. 120-122. Tefera testified that she started to receive SSDI and SSI in May 1995 when she was unable to work because of a back injury. R. 124. She noted that she returned to work in 1997, but was laid off in 2001 due to her back problems. R. 125. Between late 2001 and January 2003, Tefera did not work and collected unemployment benefits and disability checks. R. 123, 126. At the time of the 2011 hearing, Tefera worked as a lab technician earning $21.25 an hour. R. 127. She explained to the ALJ that the job was "seasonal," meaning that she worked four days a week for a total of thirty two hours during the four months of summer and five days a week for forty hours during the remaining eight months of the year. R. 127-28.

When the ALJ asked Tefera about her expenses, she stated that she had monthly expenditures of $1,047 for rent with utilities included, $200 for car insurance, $125 for gasoline, $375 for food, $80.00 for her cellular telephone, $140 for cable and Internet and $300 for her credit card, which had a balance of roughly $3,800. R. 128-31. She also testified to being a single mother with a daughter in college, receiving health insurance through her job, having diabetes and paying $120 a month for co-payments and insulin. R. 128-30. Tefera explained that she "struggl[ed]" to pay her daughter's college tuition and responded to a question about savings saying, "[i]t's I go check-by check. Savings, I might have like $500." R. 131.

The ALJ then invited Tefera to share anything else with him, at which time she stated that she was not at fault in causing the overpayment. Id. Tefera asserted that she submitted payment stubs from her various jobs and "kept calling" the SSA office to have the disability payments stopped. Id. She also explained to the ALJ that she lived in subsidized housing and that the payments she received from the SSA "[did] not go in [her] pocket," but rather to the rental office. R. 133-34. According to Tefera's testimony, she sent a letter to the SSA informing the agency that the Social Security payments she received went towards her rent. Id.; see R. 57. Tefera told the ALJ that she "couldn't control the money" because it was "direct deposit" and the rental office could see how much money was deposited and would "take it from there." R. 134.

### 2. *Findings of the ALJ*

The ALJ found: (1) Tefera's work activity was above substantial gainful activity ("SGA") levels,[4] which resulted in an overpayment of benefits in the amount of $22,337.90 for the period of April 1995 to September 2003; (2) Tefera was not at fault in incurring the overpayment, as evidenced by her "good history of reporting her earnings to this agency;" (3) recovery of overpayment would not defeat the purpose of Title II of the Act because Tefera's net income exceeded her monthly expenses; (4) since Tefera's earnings were "more than adequate to require [her] to repay the subject overpayment," recovery of the overpayment "would not be against equity and good conscience;" and (5) accordingly, Tefera was liable for repayment of the overpayment. R. 14. In explaining his reasoning with respect to Tefera's ability to pay, the ALJ found that Tefera earned over $40,000 in 2010 and anticipated that her current earnings would exceed $41,000, with an average gross monthly income of $3,450 and monthly expenses of

---

[4] Substantial gainful activity "means work that— (a) [i]nvolves doing significant productive physical or mental duties; and (b) [i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510.

8

$2,390.  Id.  The ALJ also noted that Tefera saved $500 a month and "manage[d]" to pay her daughter's recurring college tuition payments of $2,400.  Id.  The ALJ ultimately recommended that Tefera be permitted to repay the overpayment in installments of $50.00 a month.  R. 14-15.

### C. Tefera's Challenges to the ALJ's Findings

"In light of [Tefera's] *pro se* status, the [C]ourt holds her pleadings to 'less stringent standards than formal pleadings drafted by lawyers,'" Ming v. Astrue, No. 07-4567, 2009 WL 2495947, at *4 (E.D.N.Y. Apr. 13, 2009) (quoting Haines v. Kerner, 404 U.S. 519, 520 (1972)), and "will interpret [Tefera's] pleadings to raise the strongest arguments that they suggest." Id. (citation and quotation mark omitted).

Tefera contends that the ALJ erred in determining that she could afford to repay the $22,337.90 overpayment.  D. 15 at 3-4.  Specifically, she argues that many of the ALJ's findings with respect to her earnings and ability to repay were inaccurate, including the ALJ's calculation of her 2010 income and his finding that she saved $500 a month.  Id.  Contrary to the ALJ's findings, Tefera maintains that she made only $36,450 in 2010 and that she testified at the hearing that she had a total of $500 in savings.  D. 15 at 4.  Tefera further contends that she should not be responsible for the overpayment because she did her part to avoid overpayment and the SSA failed to properly perform its duties to prevent the same.  D. 15 at 4-5.

In Tefera's request to the Appeals Council for review of the ALJ's decision, she also disputed the ALJ's determination that she was advised of her right to counsel but "chose to appear and testify without the assistance of an attorney."  R. 106.  Tefera contended that she neither could afford a private attorney nor obtain free legal assistance and therefore "had no choice but to appear by [herself] for [her] hearing."  Id.  Finally, Tefera reasserted the argument raised before the ALJ that she should not be responsible for the overpayment because she lived

in subsidized housing and some of the overpayment went directly to the apartment complex via rental payments. R. 108, 133-34. Tefera explained that her rent was calculated based on evidence supplied by the SSA to the rental office of her income and Social Security benefits and "when the benefit[s] stopped [her] rent went down." R. 108.

### 1. The ALJ's Determination of Fault

The ALJ concluded in his written decision that Tefera "was not at fault in causing the overpayment (20 [C.F.R.] [§§] 404.506(a), 404.507, and 404.510a)," R. 14, and the Commissioner does not contest this finding, D. 19 at 5. During the hearing, the ALJ stated to Tefera, "I don't think you're at fault . . . [t]he record I see shows that you were pretty consistent and reliable in reporting your earnings," R. 132, and echoed this reasoning in his final decision when "credit[ing] [Tefera's] good history of reporting her earnings," R. 14. These statements make clear that, although the ALJ cited to three regulations in his written decision, R. 14, he based his finding of no fault largely on 20 C.F.R. § 404.507, that is, that Tefera did not make incorrect statements, fail to produce material information or accept payments which she knew or could have known were incorrect. 20 C.F.R. §§ 404.507(a)-(c). The extent to which the ALJ considered the applicability of 20 C.F.R. § 404.510a, apart from citing to it, is less apparent.

Section 404.510a applies in circumstances where a claimant accepts an overpayment because of reliance on incorrect information from an official within the SSA with respect to a provision of the Act or pertinent regulations. Id. § 404.510a. "[R]ecovery is deemed to be 'against equity and good conscience' where such claimant shows the requisite reliance on such erroneous information flowing from an official misinterpretation." Beaudry, 1991 WL 319161, at *7 (citing 20 C.F.R. § 404.512(a)). Though the First Circuit has not addressed directly what constitutes the requisite level of reliance, some courts within other Circuits have interpreted the

10

reliance prong to include even "mere receipt and exhaustion, for ordinary living expenses, of the overpaid monies." Id. and cases cited. Misinterpretation has required the claimant to make "actual inquiry with respect to either the law or an entitlement to benefits under the law." Id. at *8; see Valente v. Sec'y of Health and Human Servs., 733 F.2d 1037, 1044-45 (2d Cir. 1984) (ALJ erred in not considering § 404.510a where claimant's wife "contacted SSA repeatedly because she felt the checks must soon stop, [and] on each occasion the SSA employee . . . told her they were entitled to keep the check"); Lieberman v. Shalala, 878 F. Supp. 678, 681 (S.D.N.Y. 1995) (directing ALJ to consider the applicability of § 404.510a on remand where claimant "claimed that she telephoned the SSA on numerous occasions concerning her benefits" and purportedly was told they would terminate at a later date); see also Rodysill v. Colvin, 745 F.3d 947, 952 (8th Cir. 2014) (mere fact that SSA continued to provide benefits after claimant reported work activity did not satisfy § 404.510a requirements).

Based on these standards, Tefera may be entitled to waiver of repayment under § 404.510a. Tefera asserted in her waiver application, request for reconsideration and at the hearing that she repeatedly telephoned the SSA to have the payments stopped. R. 22, 27, 50, 131. According to the reasons she cited in her Request for Waiver of Overpayment Recovery, Tefera was told by an SSA employee that she "[would] receive checks until [the SSA] decided to stop paying [her]." R. 50. The record also contains a letter that Tefera wrote in October 2003 describing another telephone call during which she requested that the payments stop and was told by an SSA employee that "she [was] going to contact the Lynn office to stop the payment[s]." R. 57. In her request for reconsideration, Tefera further claimed that every time she called to have the payments stopped she was told, "we will send you a letter regarding your benefit[s]." R. 22. During the hearing, however, the ALJ did not question Tefera about any of these

11

telephone calls or letters to establish whether she was entitled to waiver pursuant to § 404.510a. R. 121-36.

The ALJ's written decision, moreover, does not indicate whether he considered the potential application of § 404.510a to Tefera's case and rejected it, or simply did not consider it at all. R. 13-14. The initial recitation of the relevant regulations, R. 13, makes no mention of § 404.510a. However, the ALJ then cited to 20 C.F.R. §§ 404.506(a), 404.507, *and* 404.510a in concluding that Tefera was not at fault, R. 14, suggesting that he at least considered its application in this case. Nevertheless, for the ALJ to have determined properly whether § 404.510a applied, he at least would have had to reach whether Tefera relied upon erroneous information from an official source. See Setian v. Apfel, 110 F. Supp. 2d 24, 27-28 (D. Mass 2000) (quoting Sims v. Apfel, 530 U.S. 103 (2000)) (noting that "because 'Social Security proceedings are inquisitorial rather than adversarial[,] . . . [i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against' [recoupment]") (emphasis in original);

Ordinarily, remand would not be necessary since the determination of no fault under § 404.507 was based on substantial evidence. See Rodriguez Pagan, 819 F.2d at 3. However, where, as here, the ALJ ultimately determined that Tefera was responsible for the overpayment, R. 14, and a no fault finding under § 404.510a would have automatically entitled Tefera to waiver, 20 C.F.R. § 404.512(a); see Pettegrove, 1986 WL 83450, at *3, remand is warranted. Accordingly, upon remand the ALJ should consider the applicability of § 404.510a, developing the record fully as to this issue.

    2.  *The Purpose of Title II and Equity/Good Conscience Factors*

Having found that Tefera was not at fault in causing the overpayment because of her history of reporting her earnings to the SSA, the ALJ considered whether repayment would defeat the purpose of Title II or be against equity and good conscience. R. 14.

> i. Title II

With respect to the analysis of Title II, the ALJ relied on Tefera's testimony of her earnings and expenses at the time of the hearing and found that recovery would not impose undue financial hardship. R. 14, 127-31; see 20 C.F.R. §§ 404.508(a)-(b). Tefera testified that her hourly wage at the time of the hearing was $21.25 and that she worked forty hours per week eight months out of the year and thirty two hours per week during the remaining four months. R. 127-28. From this information, the ALJ calculated Tefera's current yearly income as $41,500, with gross monthly earnings of $3,450. R. 14. Tefera's testimony also indicated that her recurring monthly expenses, including rent, medical expenses, food, car insurance, gasoline, cable/Internet and credit card payments, totaled roughly $2,390. R. 127-31. The calculation of these figures support the ALJ's conclusion that Tefera's expenses would be "well under her net income." R. 14; see Rodriguez, 647 F.2d at 222. The ALJ therefore did not err in determining that repayment would not defeat the purpose of Title II. Beaudry, No. 90-30093-F, 1991 WL 319161, at *5 ("[r]ecovery of overpaid benefits thwarts the intent of Title II where a claimant's financial resources, apart from the overpaid funds, are insufficient to meet ordinary and necessary living expenses, i.e., where the claimant is unable to repay without undue financial hardship") (citations omitted).

Moreover, the ALJ's determination with respect to Title II was not in error even in light of any inaccuracies in his findings regarding her income. Compare R. 14 with R. 109. Reversal on any such alleged error alone is not warranted where the standard for determining whether

13

repayment would defeat the purpose of Title II is whether the claimant "needs substantially all of [her] current income . . . to meet current ordinary and necessary living expenses." 20 C.F.R. § 404.508(b) (emphasis added). Although Tefera's testimony that she "[went] check-by-check" and "might have" roughly $500 in savings, R. 131, supports her argument that her total savings, was $500, the ALJ's finding that Tefera saved $500 a month was not unreasonable given the difference between her monthly income and expenses. R. 14; see Rooney v. Astrue, No. 10-11601-DJC, 2011 WL 6026908, at *10 (D. Mass. Dec. 5, 2011) (noting that "[i]t [is] the duty of the ALJ to resolve [any] conflicts in the evidence, and this Court must defer to the ALJ's judgment as long as it is supported by substantial evidence") (citation and internal quotation mark omitted).

ii. Equity and Good Conscience

The ALJ's last line of inquiry considered whether such repayment would be contrary to equity and good conscience. The ALJ, citing to 20 C.F.R. § 404.509, found that repayment would not be against equity and good conscience because "[Tefera's] earnings [were] more than adequate to require [her] to repay the subject overpayment of $22,337.90." R. 14. However, "the individual's financial circumstances are not material to a finding of against equity and good conscience." 20 C.F.R. § 404.509(b). Rather, the regulatory standard for determining whether repayment would be against equity and good conscience requires the ALJ to examine whether a claimant "[c]hanged his or her position for the worse . . . or relinquished a valuable right . . . because of reliance upon a notice that a payment would be made or because of the overpayment itself." Id. § 404.509(a)(1); see, e.g., Spirt v. Heckler, No. 83-2437-MA, 1984 WL 62786, at *2 (D. Mass. Feb. 3, 1984) (finding that repayment against equity and good conscience where claimant relinquished right to compensation under terms of private disability insurance policy in

14

reliance on SSA's incorrect payment of benefits). While the Commissioner "has considerable discretion in making these determinations," Valente, 733 F.2d at 1041, "failure to apply the correct legal principles is grounds for reversal," Yankun, 473 F. Supp. 2d at 150 (citation omitted). Given that proper application of the regulation may have changed the ALJ's decision, reversal is warranted.

The ALJ also failed to develop a record that would facilitate proper analysis of the equity and good conscience prong. While a claimant typically carries the burden to show that she relied to her detriment on the notice or receipt of an overpayment, see Beaudry, 1991 WL 319161, at *6, where, as here, there is an unrepresented plaintiff, the ALJ must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." Mickevich v. Barnhart, 453 F. Supp. 2d 279, 287 (D. Mass. 2006) (citation omitted).

The record shows that Tefera testified that she lived in subsidized housing, some of the overpayment went directly towards her rent and she did not have control over this money. R. 133-34. She stated: "the money went to the rent office, some of the money for eight years . . . the money doesn't go to my pocket. It goes to the rent office . . . it was direct deposit. I couldn't control the money." R. 134. Rather than questioning Tefera further, the ALJ replied, "that's not really relevant now because . . . that all goes to whether I find you're at fault or not and I've already determined that you're not at fault." Id. This evidence, however, also relates to the equity and good conscience prong, that is, whether Tefera relied to her detriment on the overpayment. See Beaudry, 1991 WL 319161, at *6.

"Detrimental reliance . . . occurs where an overpaid claimant . . . takes action or incurs an obligation as a direct result of the expectancy or receipt of incorrect payments, and where such action or obligation would not have been undertaken but for the expectancy or receipt of

15

incorrect payments." Id. and cases cited. "Although the individual must actually incur the expense or obligation . . . the change need not be dramatic." McConnell v. Dir., Office of Workers' Comp. Programs, U.S. Dep't of Labor, 993 F.2d 1454, 1461 (10th Cir. 1993) (citations and internal quotation mark omitted). According to Tefera, "[she] pa[id] rent according to [her] income so the rent office calculated [her] wages and Social Security benefit[s] for eight years [and] they determined [her] rent . . . when the benefit[s] stopped [her] rent went down." R. 108. This description implies that Tefera incurred an obligation to pay higher rent as a direct result of the receipt of incorrect payments and that she would not have undertaken the obligation but for the receipt of the overpayment. It is not clear, however, that the ALJ considered this obligation or whether it caused Tefera to "[c]hange[ ] . . . her position for the worse . . . or relinquish[ ] a valuable right." 20 C.F.R. § 404.509(a)(1). If the record upon remand demonstrates that Tefera's rent increased as a result of the overpayment and she was personally responsible for paying more money to the rental office, then her position may have changed for the worse. See Cucuzzella v. Weinberger, 395 F. Supp. 1288, 1298 (D. Del. 1975) ("change of position may be quite minor, as long as it involves an expenditure which would not have been made but for the incorrect benefit payment").

On the present record, the Court cannot determine whether substantial evidence supports waiver of the overpayment under the regulatory definition of equity and good conscience. For one example, the administrative record, in its present form, does not indicate whether Tefera personally paid more in rent at any time because of inclusion of the overpayment in the subsidized rent calculation. Therefore, on remand the ALJ should address this factor.

## V. Conclusion

For the above reasons, Tefera's motion to reverse, D. 15, is ALLOWED and the Commissioner's motion to affirm, D. 18, is DENIED and the matter is remanded to the ALJ for further proceedings consistent with this opinion.

**So ordered.**

/s/ Denise J. Casper
United States District Judge